**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JOSE VEGA-COLON | : | 3:21-cv-00175-KAD |
| *Plaintiff* | : | |
| | : | |
| v. | : | |
| | : | |
| LAYAU EULIZIER, | : | |
| TOWN OF WETHERSFIELD and | : | |
| JOHN DOES | : | JANUARY 16, 2023 |
| *Defendants* | : | |

<u>**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**</u>

### I.   PRELIMINARY STATEMENT

The Plaintiff, Jose Vega-Colon, brought a complaint individually and as Administrator of the Estate of Anthony Vega-Cruz, against Officer Layau Eulizier dated October 27, 2020, and filed on February 10, 2021.  Count One alleges excessive force in violation of Plaintiff's decedent's Fourth Amendment rights under 42 U.S.C. Section 1983. Count Two alleges deprivation of constitutional rights, including the right to familial relationship in violation of the Fourteenth Amendment. Counts Three, Four and Five allege State claims for battery, negligence, and wrongful death respectively. Count Six alleges excessive force in violation of Plaintiff's decedent's rights under Connecticut's Constitution.

Defendant Eulizier argues that his use of force was unquestionably reasonable when in reaction to Plaintiff's decedent's act of accelerating his vehicle toward Officer Eulizier when the Defendant was less than five feet from the front of the suspect's vehicle. In addition to exercising a justifiable use of self-defense under both federal and state law Defendant Eulizier acted reasonably in protecting those in proximity from the risk of

Plaintiff's decedent's dangerous and reckless operation of his vehicle. Officer Eulizier's use of force was clearly within his constitutional and statutory right of self-defense and consistent with the legitimate governmental interest of protecting innocent people. His actions were taken in a tense situation where he was forced to make a split-second decision under life threatening circumstances where, if he didn't act, he may not have had a second chance. Officer Eulizier's decisions were objectively reasonable under the Fourth Amendment and far from arbitrary, or conscience shocking, in a constitutional sense necessary to support Plaintiff's Fourteenth Amendment claim or Connecticut's constitutional claim.

Plaintiff's state law claims should be dismissed because Officer Eulizier's actions were reasonable and privileged under Connecticut General Statutes Sections 53a-19 and 53a-22. He is entitled to discretionary governmental immunity and the material facts do not support Plaintiff's alleged state theories of liability.

**II.   STANDARD FOR SUMMARY JUDGMENT**

A motion for summary judgment is properly granted only if there is "no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *O'Hara v. Nat'l Union Fire Ins. Co. of Pittsburg, PA*, 642 F.3d 110, 116 (2d Cir. 2011).  Thus, the role of the district court in deciding a summary judgment "is to determine whether genuine issues of material fact exist for trial, not to make findings of fact." *Id*. In making this determination, the Court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought."  *Garcia v. Hartford Police Dept.,* 706 F.3d 120,127 (2d Cir. 2013).

"The moving party bears the burden of establishing the absence of any genuine issue of material fact. "*Zaleski v. City of Bridgeport Police Dept.*, 613 F3d 336, 340 (2d

Cir. 2010). "Once a moving party has satisfied that burden, to defeat the motion the party opposing summary judgment must set forth 'specific facts' demonstrating that there is a 'genuine issue' for trial." *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  The non-moving party must point to more than a mere "scintilla" of evidence in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "Unsupported allegations do not create a material issue of fact." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

"The party opposing summary judgment cannot defeat the motion by relying on the allegations in her pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible. At the summary judgment stage of the proceedings, plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996).  Thus, rather than merely "deny the moving party's allegations in a general way," the party opposing summary judgment "must present competent evidence that creates a genuine issue of material fact." *FEC v. Toledano*, 317 F.3d 939, 950 (9th Cir. 2002) (citing *Anderson*, 477 U.S. at 248-52); *see [\*\*16] also Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) ("[U]nsupported allegations do not create a material issue of fact."). *McKinney v. City of Middletown*, 49 F.4th 730 (2d Cir. 2022)

### III. ARGUMENT

#### A.  COUNT ONE: OFFICER EULIZIER'S USE OF FORCE DID NOT VIOLATE PLAINTIFF'S CONSTITUTIONAL RIGHT

##### 1. OFFICER EULIZIER'S USE OF FORCE WAS OBJECTIVELY REASONABLE UNDER THE FOURTH AMENDMENT AND CONNECTICUT GENERAL STATUTES

Count One of Plaintiff's Complaint alleges excessive force under the Fourth Amendment.

The clear standard articulated in *Tennessee v. Garner*, 471 U.S. 1 (1985) standing alone answers the reasonableness of Officer Eulizier's use of force. "…where an officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. C.G.S. § 53a-22 justifies an officer's use of deadly force to "Defend himself or herself or a third party from the use or imminent use of deadly force."

"The reasonableness depends only upon the officer's knowledge of circumstances immediately prior to the moment that he made a split-second decision to employ deadly force," *Salim v. Proulx*, 93 F.3d 86, 92 (2d Cir. 1996). No court has ever found that when an officer is in close proximity to a suspect's vehicle accelerating in the direction of the officer, that deadly force would not be objectively reasonable under the circumstances. Cases where courts found the use of deadly force did not amount to a constitutional violation in closely analogous circumstances contain facts less compelling than the present case.  Before describing these rulings, it is appropriate to apply undisputed facts in a *Graham v. Connor* analysis.

The Supreme Court has held that "all claims that law enforcement officers have used excessive force - deadly or not - in the course of an arrest, investigating stops or other seizure of a free citizen should be analyzed under the Fourth Amendment and its reasonableness standard." *Graham v. Connor*, 490 U.S. 386 (1989). To determine whether police officers have used excessive force, the finder of fact must consider whether the force was reasonable in light of the circumstances and facts there and then confronting the police officers. Whether a given quantum of force is excessive depends on "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or

others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight", and must allow "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id*. at 396-97.

This case represents the epitome of a *Graham* incident. The entire incident from when Vega Cruz fled from Officer Salvatore to the shooting that occurred within less than a minute, involved rapidly evolving circumstances that were intense and uncertain. Officer Eulizier had to literally make a split-second decision when the suspect vehicle suddenly drove toward him. The *Graham* factors heavily favor Officer Eulizier's decision to employ deadly force.

**SEVERITY OF UNDERLYING OFFENSES:**

The offenses committed by Vega-Cruz on April 19, 2019, include infractions, misdemeanors, and felonies. At the time of the incident Vega-Cruz violated several motor vehicle violations. His car was unregistered, uninsured, had illegal tinted windows and he had no driver's license. None of these violations are relevant to the use of force.

At the time Vega-Cruz was stopped by Officer Salvatore, Vega-Cruz he was operating the Infinity G35 he owned with attached license plates that had been assigned to another vehicle. As a matter of common knowledge sometimes criminals misuse plates to detect apprehension when planning to engage in more serious criminal activity.

After initially pulling over to the side of the road when signaled by Officer Salvatore, Vega-Cruz fled at a high rate of speed when Salvatore approached on foot. That act

amounted to Interfering with an Officer, CGS § 53a-167a, a class A misdemeanor in preventing Officer Salvatore from conducting his lawful traffic stop. It has long been recognized that such flight provides reasonable suspicion to believe the suspect is involved in more serious misconduct. Driving away from an officer at an excessive speed, and recklessly, in a thickly settled section of the city provided reasonable suspicion that the vehicle was stolen. *Martyn v. Donlin*, 151 Conn. 402 (1964).

When fleeing from Officer Salvatore, Vega-Cruz exceeded the speed limit (C.G.S. §14-219) and/or drove at an unreasonable speed for the conditions on a wet road in a populated area with moderate traffic (C.G.S. § 14-218a). He disobeyed Officer Eulizier's signal to stop in violation of § 14-223(b), a class A misdemeanor. He illegally changed lanes and spun out. His driving constituted reckless driving in violation of C.G.S. § 14-222 a misdemeanor.

As Eulizier approached the suspect vehicle on foot, it recklessly backed in front of oncoming traffic constituting a second act of recklessly operation.  At the time Officer Eulizier found himself near the front of the suspect vehicle he ordered Vega-Cruz to show his hands. Seconds earlier Vega-Cruz knew two marked Wethersfield police cruisers had signaled him to stop. He saw Officer Salvatore approach his vehicle and  just before the shooting saw Officer Eulizier near the front of his vehicle. Vega-Cruz ignored a clearly recognizable officers' lawful orders amounting to multiple violations of § 53a-167, interfering with an officer. Rather than submitting to the officer's authority and remaining stationary Vega-Cruz accelerated toward Officer Eulizier establishing probable cause of attempt to commit Murder with Special Circumstances, § 53a-54b; or attempt to commit Assault of an Officer in violation of § 53a-167c, a class C felony; or at very least reckless endangerment in the first degree, § 53a-63, a class A misdemeanor.

**IMMEDIATE THREAT TO OFFICERS OR OTHERS:**

In considering this *Graham* factor from the perspective of Officer Eulizier, it is essential to follow the Supreme Court's instruction allowing "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving…" *Id.* at 396-97. Approximately 36 seconds elapsed from the time Vega-Cruz fled from Officer Salvatore until the shots were fired. The Infiniti accelerated away from the traffic stop at 18:00:06.  The Infiniti accelerates and Officer Eulizier fires two rounds at 18:00:36. Vega-Cruz committed all the relevant offenses and dangerous acts within those 30 seconds.

The precipitating event that resulted in the shooting was Vega-Cruz's decision to accelerate toward Officer Eulizier who was standing approximately 4.5 feet from the front left side headlight. Approximately 4 seconds elapsed from when Officer Eulizier gets out of his cruiser and yells "show me your hands" as the Infiniti reverses in a clock-wise direction across the southbound lanes of the Silas Deane Highway. Officer Eulizier follows the Infiniti on foot. (Ex. A, State Police Sworn Investigative Report, describing Ex. H Dashcam Video Report).

Approximately 4 seconds later "Officer Salvatore rams the Infiniti in the driver's door/front quarter panel area as Officer Eulizier runs along-side the driver's door of Officer Salvatore's cruiser." (Ex. A, p. 25). Officer Salvatore rammed the Infiniti fearing the suspect vehicle was about to strike Officer Eulizier. (Ex. B, Peter Salvatore's Sworn Statement). The dynamics of the movement of the Infiniti caused by Vega-Cruz's operation and the ramming of the Infiniti and Eulizier's movement resulted in Officer Eulizier position near the front driver's side of the Infiniti.

Officer Eulizier pointed his gun at Cruz-Vega and instructed him to show his hands. Rather than complying and remaining in a stationary position, Vega-Cruz chose to accelerate toward Officer Eulizier, at which point Eulizier attempted to back away and fired 2 shots as he backed and then moved to the side. (Exhs. C; E; G and, I).

Both shots were fired as the Infiniti drove toward Officer Eulizier. The first shot struck Vega-Cruz. The second missed. Officer Eulizier was near the front of the Infiniti for approximately 2 seconds before the car accelerated toward him. (Exhs. E; G; and H).

The total time from when Officer Eulizier got out of his vehicle until the shots were fired was approximately 12 seconds. (Exhs. E; G; and H).

Officer Eulizier observed the reckless, irrational and dangerous actions of Vega-Cruz in the preceding 24 seconds before he exited his cruiser. He reasonably believed the driver would comply with his orders hoping the event would end peacefully. In the 10 or 12 seconds after he exited his vehicle, he intended to place himself in a position where he could observe and better communicate with the suspect.  The dynamics of Vega-Cruz's operation and the ramming of the Infiniti put Officer Eulizier in an unexpected position but in a place where Vega-Cruz could clearly see him.

Most importantly, when Vega-Cruz chose to accelerate forward, Officer Eulizier had a second or less to decide how to react. During that split-second he could not predict how fast Vega-Cruz would accelerate his vehicle or his direction or whether he would be able to outrun or move to a position of safety or risk being struck by the vehicle. At very least Officer Eulizier was in the zone of danger facing an imminent risk of death or serious injury in this rapidly evolving tense and uncertain situation.

**ACTIVE RESISTANCE OR ATTEMPT TO EVADE ARREST BY FLIGHT:**

Vega-Cruz's repeated refusals to comply with officers' orders and repeated attempts to flee in a reckless manner supports the ultimate decision to use deadly force. His final decision 2 seconds before he was shot was either an intentional act to harm Officer Eulizier, an act demonstrating an indifference to human life or at a minimum, a reckless, dangerous act posing a risk of death or serious injury to Officer Eulizier or others.

It is not necessary for all the *Graham* factors to favor the officer's decision to use the level of force in question. The immediate threat factor is the most important test and here it supports Officer Eulizier's decision to employ deadly force. At the second deadly force was used it was objectively reasonable for Officer Eulizier to perceive that he was about to be subjected to serious injury or death. Applying the immediate threat doctrine to the seminal cases of *Tennessee v. Garner, Graham v. Connor* and *Salim v. Proulx*, the court should find that the use of deadly force was constitutional.

## 2. THE USE OF DEADLY FORCE IN SELF DEFENSE WAS OBJECTIVELY REASONABLE

"Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985).

A Peace Officer is justified in using deadly force when he reasonably believes it to be necessary  to (1) Defend himself or a third person from the use or imminent use of

deadly force; or (2) to effect an arrest or prevent the escape from custody of a person whom he reasonably believes has committed or attempted to commit a felony which involved the infliction or threatened   infliction of serious physical injury and if, where feasible, has given warning of his intent to use deadly physical force. C.G.S. § 53a-22

A person is justified in using deadly physical force when they reasonably believe another person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm. C.G.S. § 53a-19.

There can be no dispute that Officer Eulizier finding himself near the front of the stationary suspect vehicle from a distance, of less than 5 feet could have objectively believed that he was at imminent risk of great bodily harm or death when the vehicle suddenly began to accelerate toward him. The use of deadly force within that second was unquestionably reasonable under *Tennessee v. Garner* and Connecticut General Statutes.

A consensus of circuit courts have found that officers acted reasonably in using deadly force in self-defense when it was objectively reasonable to believe suspect was driving in the direction of the officer(s). The below cases contain similar circumstances and rely on Supreme Court and established precedent supportive of Officer Eulizier's objectively reasonable use of force.

The Sixth Circuit recently analyzed issues similar to the present case. "Deadly force, as was used in this case, is reasonable only when an officer has probable cause to believe a suspect poses an immediate threat to the officer or to others. *Tennessee v. Garner*, 471 U.S. 1, 11, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985). When deadly force is used against a fleeing vehicle, we ask whether the officer had "reason to believe that the [fleeing] car present[ed] an imminent danger" to "officers and members of the public in

the area." *Smith v. Cupp*, 430 F.3d 766, 775 (6th Cir. 2005). For example, deadly force is reasonable when a driver appears ready to hit an officer or bystander with his vehicle. *See Cass*, 770 F.3d at 375 (*quoting Hermiz v. City of Southfield*, 484 Fed. Appx. 13, 16 (6th Cir. 2012) (*citing Brosseau v. Haugen*, 543 U.S. 194, 197-200, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004)). It is generally no longer reasonable once the vehicle has moved away and the officer or bystander has reached a position of safety. *Gordon v. Bierenga*, 20 F.4th 1077, 1083 (6th Cir. 2021). However, even if there is no one in the direct path of a fleeing vehicle, an officer still may use deadly force if "'the officer's prior interactions with the driver suggest that the driver will continue to endanger others with his car.'" *Cass*, 770 F.3d at 375 (*quoting Hermiz*, 484 F. App'x at 16). *Francis v. Huff*, 2022 U.S. App. LEXIS 28595; 2022 Fed. App. 0407N (6th Cir.); 2022 WL 7973109.

The Eleventh Circuit captured the deadly force threat facing Officer Eulizier at the moment Vega Cruz's vehicle accelerated toward him. The size of the vehicle is of no matter. The axiomatic rule remains the same. "A fully loaded logging truck was converted into a deadly weapon as it moved directly at the officers at 5 to 10 miles per hour. "It is axiomatic that when an officer is threatened with deadly force, he may respond with deadly force to protect himself." *Hunter v. Leeds*, 941 F.3d 1265, 1279 (11th Cir. 2019). *Davis v. Waller*, 44 F.4[th] 1305 (11th Cir. 2022).

In *Ybarra v. City of Chicago*, 946 F3d 975 (7th Cir. 2020) deadly force was deemed reasonable when the suspect drove in officers' general direction and even when he drove past them. The court noted that individuals need not be in the direct path of the threat. "Two officers fired 16 shots while the suspect vehicle was in the parking lot. The officers had mere seconds to determine how to respond, and that determination was informed by

the violent acts the officers had witnessed less than ninety seconds previously. Regardless of whether the officers reasonably believed that Cruz presented a direct threat to the officers' own safety—whether by driving toward or shooting at them—there is no genuine dispute of material fact that the officers acted reasonably in using deadly force against Cruz to prevent his escape to protect others in the immediate vicinity. *See Scott*, 346 F.3d at 759. The threatened individuals need not have been placed in the direct path of the threat. Deadly force may be exercised if the suspect's actions place the officer, his partner, or those in the immediate vicinity in imminent danger of death or serious bodily injury." (citation and internal quotation marks omitted) Their use of deadly force to prevent escape continued to be reasonable even as Cruz drove past the officers. Cf. *Horton*, 883 F.3d at 952." The court does not describe the positions or distances of the officers as the suspect vehicle attempted to escape. While the underlying offense was more serious and operation of the suspect vehicle prior was more reckless in the *Ybarra* case, the immediate risk, which was the precipitating event leading to the shooting of Vega Cruz, was far greater in the present case with Officer Eulizier standing less than 5 feet from the front of the suspect vehicle during the second it accelerated in his direction.

*Spencer v. City of Orlando,* 725 Fed. Appx 928 (11th Cir. 2018) is a closely analogous case. The suspect vehicle was stopped for a seat belt offense.  As the officer approached the vehicle fled, spun out and was struck by an officer's explorer. Even though plaintiff claimed the suspect vehicle stalled out, the court cited cases where, as in this case, the officer reasonably believed the suspect used and threatened to use his car as a weapon immediately preceding the use of force. "Indeed, we have "consistently upheld an officer's use of force and granted qualified immunity in cases where the decedent used or threatened to use his car as a weapon to endanger officers or civilians

immediately preceding the officer's use of deadly force." Assuming plaintiff claims it may have been possible for Officer Eulizier to safely retreat, the McCullough case addresses that hindsight issue which should not factor into Officer Eulizier's decision considering the circumstances and the Graham court admonishment that courts not to apply 20/20 hindsight. In *McCullough v. Antolini*, 559 F.3d 1201, 1207 (11th Cir. 2009), officers' use of deadly force was not unreasonable after suspect drove in threatening manner even though the original traffic stop was only for excessive window tint. "What we have said before in similar circumstances applies here: "Even if in hindsight the facts show that [the officers] could have escaped unharmed ... a reasonable officer could have perceived that [Marquis] was using [his car] as a deadly weapon," and thus the officers "had probable cause to believe that [Marquis] posed a threat of serious physical harm." *Robinson v. Arrugueta*, 415 F.3d 1252, 1256 (11th Cir. 2005). Id at 932.

In *Latits v. Phillips*, 878 F. 3d 541 (6th Cir. 2017), the deceased was stopped for a motor vehicle violation. Following a pursuit one of 3 officers attempting to block the suspect's vehicle, "had a very low speed head-on collision." One officer jumped out of his vehicle and ran toward the suspect vehicle which reversed with the officer following on foot. One second later gunshots were fired. No persons could be seen on the cruiser camera immediately behind the suspect vehicle as it reversed. Id at 546. Officer Phillips was terminated for policy violations including, pursuing as 3rd vehicle without permission, using a PIT maneuver in violation of a direct order and running up to suspect vehicle instead of taking a tactical position using his vehicle as cover.

"The Sixth Circuit has developed "a consistent framework in assessing deadly-force claims involving vehicular flight." *Cass v. City of Dayton*, 770 F.3d 368, 375 (6th Cir. 2014). The "critical question" is whether the officer had objective "'reason to believe that

the [fleeing] car presents an imminent danger' to 'officers and members of the public in the area.'" *Id*. (*quoting Smith v. Cupp*, 430 F.3d 766, 775 (6th Cir. 2005)). Deadly force is justified against "a driver who objectively appears ready to drive into an officer or bystander with his car," but generally not "once the car moves away, leaving the officer and bystanders in a position of safety," unless "the officer's prior interactions with the driver suggest that the driver will continue to endanger others with his car." The Sixth Circuit has found deadly force justified by prior interactions demonstrating continuing dangerousness only when the "suspect demonstrated multiple times that he either was willing to injure an officer that got in the way of escape or was willing to persist in extremely reckless behavior that threatened the lives of all those around." *Cupp*, 430 F.3d at 775 (characterizing the suspects in both *Scott v. Clay Cty.*, 205 F.3d 867, 872 (6th Cir. 2000), and *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992)). Id at 548.

The Court found an issue of fact based on video showing the officer aimed and shot after the hood of the suspect's car passed the point where it could harm the officer while he stood to the side of the vehicle. No other officers or others were in the path of the vehicle. Nevertheless, the defendant was found to be entitled to qualified immunity as no caselaw was found where an officer under sufficiently similar circumstances was held to have violated the Fourth Amendment. *Id* at 552. Violations of department policies, procedures or actions contrary to training do not negate qualified immunity. "[T]he Supreme Court has indicated that the violation of established procedure alone is insufficient to overcome a qualified immunity claim." (*citing Davis v. Scherer*, 468 U.S. 183, 194, 104 S. Ct. 3012, 82 L. Ed. 2d 139 (1984)). It must have been clearly established that the conduct at issue violates the Constitution, not internal policies." *Id* at 55.

Two cases from the Tenth Circuit contain their analysis of use of deadly force against suspects driving toward officers.

In *Johnson v. Peay*, 704 Fed. Appx. 738 (10th Cir. 2017), a motorist fled from an attempted stop for a motor vehicle offense. She made aggressive and persistent attempts to evade when officers were in close proximity. As Johnson's truck collided with Deputy Peay's vehicle he fired one shot through the windshield striking her in her head. The court granted summary judgment finding, "Johnson cannot demonstrate a clearly established constitutional right to be free from the use of deadly force after leading law enforcement on a lengthy, high-speed chase and using her truck as a weapon in close proximity to police officers." *Id* at 744.

*Estate of Ronquillo v. City and County of Denver*, 720 Fed. Appx. 434 (10th Cir. 2017). Officers attempted to force Ronquillo from his vehicle to arrest him on a warrant for motor vehicle theft. He was shot when he drove toward officers in close proximity. The use of deadly force was found to be reasonable. Citing prior case law the court stated, "It goes without saying that an officer in close quarters is no match for a two-ton vehicle." In fact, the video shows one officer jump out of the way of the vehicle mere seconds before Mr. Ronquillo returns. Therefore, in considering the factors in their totality, at the two precise moments when force was used by the officers, it was objectively reasonable to use force to stop Mr. Ronquillo (1) from fleeing and (2) later possibly running over several officers." *Id* at 439.

In *H.B. v. City of Torrance*, 790 Fed. Appx. 60 (9th Cir. 2019), videos showed decedent driving in an erratic manner swerving into oncoming traffic posing a danger to members of the public. "Because the decedent accelerated toward the officers from only a few feet away, a reasonable officer under these circumstances would have perceived

the decedent's actions to constitute a significant and immediate threat to the officers in the path of her vehicle and to other members of the public who were in the vicinity." *Id* at 62.

*Thevenin v. French*, 850 Fed. Appx 32 (2d Cir. 2021) is a recent and easily distinguishable case where the court denied qualified immunity based on disputed issues of fact. The officer was about four feet from the suspect vehicle when the shots were fired. However, in Thevinin a witness testified French exited his police vehicle and, without saying anything, fired eight to twelve shots at Thevenin all at once. Most significantly the eyewitness further testified at his deposition that, at the time of the shooting, the Honda was not moving. If Vega Cruz had not driven forward Officer Eulizier would not have been forced to make a decision to employ deadly force.

### 3. OFFICER EULIZIER'S USE OF FORCE TO DEFEND OTHERS WAS OBJECTIVELY REASONABLE

The Fourth Amendment test applied here is an objective test. There is no question that Officer Eulizier intentionally used force to stop Vega-Cruz. His spontaneous reaction to the car coming toward him was to stop the threat. However, an intentional use of force to stop a threat creates an objective question making the subjective intent irrelevant. Under the Fourth Amendment objective reasonable standard the court should consider the facts and the law applied to any valid justification for the officer's action. In other words, given the facts would an objectively reasonable officer believe the particular action was constitutional. In this case, objectively applying the facts to the law the separate justification to stop Vega-Cruz from seriously harming others must be considered. Apart from self-defense *Tennessee v. Garner* and C.G.S. § 53a-22 recognize the duty to protect others.

Several Supreme Court cases regarding an officer's use of force to stop vehicular flight pertain to the justification of deadly force to protect others at risk of harm by suspects fleeing from officers. *Brosseau v. Haugen*, 543 U.S. 194, (2004), *Scott v. Harris*, 550 U.S. 372, 2007, *Plumhoff v. Rickard*, 572 U.S. 765, (2014), and *Mullenix v. Luna*, 577 U.S. 7, 136 S. Ct. 305, 193 L. Ed. 2d 255 (2015), are cases in which the Supreme Court held that police officers were entitled to qualified immunity for their use of deadly force against a fleeing motorist. In Brosseau, the Supreme Court noted that the plaintiff posed a major threat to the other officers on foot in the immediate area, the occupied vehicles in the suspect's path, and potentially other people who might have been in the area. 543 U.S. at 197, 200. In *Scott*, officers attempted to stop plaintiff for speeding when he engaged police in pursuit and endangered the lives of innocent bystanders, other civilian motorists, and the officers involved in the chase. 550 U.S. at 374, 380, 383-84. In *Plumhoff*, prior to driving away from officers after being stopped in a parking lot, the plaintiff led officers on a high-speed chase, swerving through traffic at high speeds over 100 mph, which "posed a grave public safety risk." 572 U.S. at 769, 776. And in *Mullenix*, the plaintiff was traveling "at extremely high speeds, was reportedly intoxicated, had twice threatened to shoot officers, and was racing towards an officer's location." 577 U.S. at 14.

The Sixth Circuit recently found an officer entitled to qualified immunity under circumstances analogous to the present case. Gordon v. Bierenga, 40 F.4th 1077 (6th Cir. 2021). Officer Bierenga observed Gordan commit a motor vehicle violation. When the officer attempted a motor vehicle stop, Gordon fled during rush hour in the middle of a major road in a populated suburb, adjacent to residential neighborhoods and businesses. Bierenga observed Gordon make a reckless left turn in the face of oncoming traffic near a busy intersection to escape from Bierenga, causing oncoming cars to brake to avoid

colliding with Gordon as he turned into the White Castle parking lot. Several cars were parked in the parking lot. Multiple patrons and employees were inside. After Bierenga later blocked in Gordon at the drive-thru window, Gordon reversed into an occupied vehicle behind him before accelerating forward and hitting Bierenga's police vehicle. Although Gordon's contact with those vehicles occurred at a relatively low speed, his conduct showed a willingness to strike both police and civilian vehicles to effectuate his escape from police. Given the time and place at which it occurred, Gordon's reckless driving posed a risk of harm to the surrounding public.

The Court cited earlier cases that "would inform a reasonable officer that shooting a driver while positioned to the side of the fleeing car violates the Fourth Amendment, absent some indication suggesting that the driver poses more than a fleeting threat. A reasonable officer in Bierenga's position had at least some suggestion that Gordon "pose[d] more than a fleeting threat" to the surrounding public. Here Officer Eulizier was not "to the side of the fleeing car" and considering Vega-Cruz's prior actions, Eulizier had more than "some suggestion that Vega-Cruz posed more than a fleeting threat."

Officer Eulizier under these circumstances would have to make a balancing of culpability test. As best described in *Scott v. Harris*, 550 U.S 372, 384 (2007) officers and courts must take into consideration the relative culpabilities of those subjected to risk and those creating the risk. Scott employed deadly force when ramming a speeding Harris rendering him a quadriplegic. The Court mused, "So how does a court go about weighing the perhaps lesser probability of injuring or killing numerous bystanders against the perhaps larger probability of injuring or killing a single person? We think it appropriate in this process to take into account not only the number of lives at risk, but also their relative

culpability. It was respondent, after all, who intentionally placed himself and the public in danger by unlawfully engaging in the reckless, high-speed flight that ultimately produced the choice between two evils that Scott confronted. Multiple police cars, with blue lights flashing and sirens blaring, had been chasing respondent for nearly 10 miles, but he ignored their warning to stop. By contrast, those who might have been harmed had Scott not taken the action he did were entirely innocent. We have little difficulty in concluding it was reasonable for Scott to take the action that he did. Id at 384.

Although Vega-Cruz drove for a shorter distance, by contrast, the manner of his operation and circumstances including more traffic, higher population and wet roads created a greater risk than Scott's operation on a largely rural 2 lane road with very little traffic. If Officer Eulizier had not used deadly force for self-defense his action would be objectively reasonable to protect travelers on the Silas Deane who were not only potential victims but stood as identifiable persons subjected to imminent risk of harm given Vega-Cruz's reckless driving the moment before the shooting and the likely foreseeability of continued reckless operation.

### B.  OFFICER EULIZIER IS ENTILED TO QUALIFIED IMMUNITY

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009). When an official asserts a qualified immunity defense, courts consider whether "(1) the official violated a statutory or constitutional right, and (2) . . . the right was 'clearly established' at the time of the challenged conduct." *Ricciuti v. Gyzenis*, 834 F.3d 162, 167 (2d Cir. 2016) (quoting *Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)). Qualified

immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Doninger v. Niehoff*, 642 F.3d 334, 353 (2d Cir. 2011).

In excessive-force claims, the reasonableness inquiry "overlap[s]" with the qualified-immunity analysis. *Cowan*, 352 F.3d at 764. The difference is that "the qualified immunity inquiry goes on to ask whether any constitutional violation was clearly established." *Jackson v. Tellado*, 236 F. Supp. 3d 636, 661 (E.D.N.Y. 2017). A constitutional right is clearly established "when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Rivas-Villegas*, 595 U.S. ----, slip op. at 2 (per curiam) (*citing Mullenix v. Luna*, 577 U.S. 7, 11, 136 S. Ct. 305, 193 L. Ed. 2d 255 (2015); *see also Jones v. Treubig*, 963 F.3d 214, 224 (2d Cir. 2020) (right is clearly established when it would have been "clear to a reasonable officer that his conduct was unlawful in the situation he confronted").

Courts "do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 577 U.S. 7, 12, 136 S. Ct. 305, 193 L. Ed. 2d 255 (2015). The inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004) (per curiam). "[S]pecificity is especially important in the Fourth Amendment context, where . . . it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix*, 577 U.S., at 12.

"The 'clearly established' standard also requires that the legal principle clearly prohibits the officer's conduct in the particular circumstances before him. The rule's

contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018), quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

The Second Circuit has noted that "[t]o determine whether the relevant law was clearly established, we consider the specificity with which a right is defined, the existence of Supreme Court or Court of Appeals case law on the subject, and the understanding of a reasonable officer in light of preexisting law." *Terebesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014), *cert. denied,* 135 S. Ct. 1842 (2015). The law may be clearly established if "decisions from this or other circuits clearly foreshadow a particular ruling on the issue." *Ibid.* (internal quotations omitted). Although there need not be "a case directly on point," it must nonetheless be clear that "existing precedent [has] placed the ... constitutional question beyond debate." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015).

The defendant adopts the case law previously cited for the purpose of this qualified immunity. Applying the undisputed facts Officer Eulizier's use of force was not unconstitutional. Not only were his actions within the bounds of United States Supreme and Second Circuit precedent but they were consistent with the consensus of other circuits. It can't be said that existing precedent places this case between the hazy border between excessive and acceptable force or that existing precedent placed the constitutional question beyond debate. *Rivas-Villegas*, 142 S.Ct. at 7-9. Any misplaced suggestion by the plaintiff that Officer should have known he was not in danger within the second Vega-Cruz advanced toward him should be rejected. Certainly, an officer in that split-second could have objectively made a mistake in believing the suspect vehicle posed a risk of serious injury. *Saucier v. Katz*, 533 U.S.194 (2001).

In sum, the estate cannot point to a case that meets the requisite level of "specificity" to clearly establish that it was unlawful for Officer Eulizier to employ deadly force in this factual scenario. No officer making such decision could be found to be plainly incompetent. Officer Eulizier is entitled to qualified immunity.

### C. OFFICER EULIZIER'S ACTIONS WERE FAR FROM THE STANDARD NECESSARY TO SUBSTANTIATE THE PLAINTIFF'S FOURTEENTH AMENDMENT CLAIMS

The core of the concept of due process has always been an individual's freedom from arbitrary interference by the government. *See Hurtado v. California*, 110 U.S. 516, 527, 4 S. Ct. 111, 117, 28 L. Ed. 232 (1884) (*citing Magna Carta*). *See also Wolff v. McDonnell*, 418 U.S. 539, 558, 94 S. Ct. 2963, 2976, 41 L. Ed. 2d 935 (1974). "The touchstone of due process is protection of the individual against arbitrary action of government. Alleged abuses of the police power are sufficiently arbitrary to rise to constitutional magnitude only when the conduct at issue "shocks the conscience." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998); see also *Collins v. City of Harker Heights*, 503 U.S. 115, 128 (1992) (substantive due process is violated only when executive conduct "can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense").

Substantive due process, enforced by section 1983, does not afford a cause of action for police negligence. See *Daniels v. Williams*, 474 U.S. 327, 328 (1986); *Davidson v. Cannon*, 474 U.S. 344, 348 (1986). Further, because the police must act in high-tension situations "in haste, under pressure, and frequently without the luxury of a second chance," *Whitley v. Albers*, 475 U.S. 312, 320 (1986), even an intermediate level of fault, such as recklessness, is not enough to impose constitutional liability. In the context of a high-speed chase. The Supreme Court ruled that where "the officer's instinct was to do

his job as a law enforcement officer, not to induce …  lawlessness, or to terrorize, cause harm, or kill," *Cty of Sacramento*, supra, at 855, the officer's conduct did not shock the conscience; he was therefore not liable under 42 U.S.C. § 1983.

In *Daniels v. Williams*, 474 U.S. 327, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986), the United States Supreme Court held that a finding of ordinary negligence does not give rise to a claim that one's constitutional rights have been deprived under Section 1983. *Id*., 328. The *Daniels* Court reasoned that "[f]ar from an abuse of power, lack of due care suggests no more than a failure to measure up to the conduct of a reasonable person. To hold that injury caused by such conduct is a deprivation within the meaning of the Fourteenth Amendment would trivialize the centuries-old principle of due process of law." *Id*., 332. Various decisions within the United States Court of Appeals for the Second Circuit and the United States District Court for the District of Connecticut have recognized *Daniels* and denied mere allegations of negligence from implicating the Due Process Clause. *See* generally *Dodd v. Norwich*, 827 F.2d 1, 3 (2d Cir. 1987); *Van Eck v. Gallucci*, 321 F. Supp. 2d 368, 372-73 (D.Conn. 2004); *Murphy v. Bradley*, United States District Court, Docket No. 3:03cv714 (DJS) (D.Conn. January 16, 2004).

Plaintiff's familial relationship claim in paragraph 53 fails as a matter of law. In *Gorman v. Rensselaer Cty.*, 910 F.3d 40 (2nd Cir. 2018), the Second Circuit Court of Appeals adopted and outlined the current applicable legal standard for a Fourteenth Amendment deprivation of familial relationship/association claim. *Id*. at 47-48. The court noted, among other things, that: "[a] claim for infringement of the right to familial association requires conduct "'so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection." *Id*. at 47. The court also held, in part, that: " … a claim under

the Due Process Clause for infringement of the right to familial associations requires the allegation that state action was specifically intended to interfere with the family relationship." *Id*. at 48. Because plaintiff has not alleged Eulizier intended to interfere with the family relationship and his actions based on undisputed facts do not meet the necessary standard established in the Second Circuit, this claim must be dismissed.

Officer Eulizier is entitled to summary judgment on Plaintiff's Fourteenth Amendment, substantive due process claim, because none of the material facts support plaintiff's claim that Eulizier's actions were shocking to the conscience. At very least Officer Eulizier is entitled to qualified immunity on the Fourteenth Amendment claims.

This Court need not decide whether Officer Eulizier's acts violated Plaintiff's Fourteenth Amendment rights. The Court need only consider whether Supreme Court or Second Circuit precedent "'squarely governs' the specific facts at issue," In other words, is there any "precedent involving similar facts" which could "help move this case beyond the otherwise 'hazy border between excessive and acceptable force'" and thereby provide Officer Eulizier notice that his use of force was unlawful. Absent the finding of such clearly established law under the Fourteenth Amendment, the court should find Officer Eulizier to be entitled to qualified immunity.

### D. OFFICER EULIZIER'S ACTS DO NOT, AS A MATTER OF LAW, SUPPORT PLAINTIFF'S STATE LAW CLAIMS. THE UNDISPUTED FACTS ARE INSUFFICIENT TO SUPPORT ANY VIABLE STATE CAUSE OF ACTION. OFFICER EULIZIER'S USE OF FORCE WAS PRIVILEGED.

Officer Eulizier's use of force was privileged under state statute. Two statutes, Sections 53a-19 and 53a-22, authorize the use of deadly force in self-defense. Section 53a-19, the civilian, or non-peace officer self-defense statute, provides that all persons are entitled to "use of physical force in defense of person." It provides in relevant part for the use of deadly force in self-defense, with several relevant exceptions, applying to those

confronting a risk of deadly force. "[A] person is justified in using . . . deadly physical force [only if] the actor reasonably believes that such other person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm."

Section 53a-22 in relevant part provides that, "A peace officer … is justified in using deadly physical force upon another person… only when he or she reasonably believes such to be necessary to: (1) Defend himself or herself or a third person from the use or imminent use of deadly physical force."

Count Three of Plaintiff's Complaint alleges battery. Officer Eulizier's use of force in self-defense does not constitute an unlawful Battery. "The intent required for a battery is similar to that required for an assault . . . The touching must be an intentional and unpermitted contact with the body of the plaintiff. Courts have also described the required intent as being unlawful"; *Correa v. Stevens*, Superior Court, judicial district of Hartford, Docket No. CV 05 4012470, 2008 Conn. Super. LEXIS 1908 (July 18, 2008, Elgo, J.); where unlawful means "either intentional, wanton or negligent conduct in the application of force." *Moriarty v. Lippe*, 162 Conn. 371, 389, 294 A.2d 326 (1972). Consequently, "[t]he contact complained of must be harmful or offensive to the plaintiff's person." *Correa v. Stevens*, supra, superior court, Docket No. CV 05 4012470. Courts have also described the required intent as being unlawful." *Id.* Not only the action producing the injury but *the resulting injury must be intentional*." *Markey v. Santangelo*, 195 Conn. 76, 77 (1985).

Because Officer Eulizier's use of force was privileged his actions cannot be found to be unlawful. The Plaintiff's negligence claims as to Defendant Eulizier in Count Four and wrongful death claim in Count Five fail because his use of force was privileged. "The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury . . . If a plaintiff cannot prove all of those elements,

the cause of action fails . . . Generally, without proof of each of these elements, a plaintiff's cause of action fails entirely . . . In a negligence action . . . [a] causal relation between the defendant's wrongful conduct and the plaintiff's injuries is a fundamental element without which a plaintiff has no case . . ." (Internal quotation marks omitted.) *Right v. Breen*, 88 Conn.App. 583, 586-87 (2005).   "The standard of care in the ordinary negligence case is the care that a reasonably prudent person would exercise under the same circumstances." *Roach v. Ivari Int'l Ctrs., Inc.*, 77 Conn. App. 93, 102 (2003).

If the Court finds that Officer Eulizier's actions were objectively reasonable or privileged under Connecticut General Statutes the Court must find he met his duty to use reasonable care in deciding to use and in fact using deadly force, and, as a matter of law, cannot be found to have been negligent in this regard. Likewise, because a wrongful death claim requires that Eulizier must be found to be "legally at fault" under C.G.S. 52-555(a), if his actions were objectively reasonable or privileged this claim must fail.

**CONCLUSION**

The dispositive issues here can be decided by focusing on the 2 seconds during which Officer Eulizier stood in plain view of Vega-Cruz's stationary vehicle, with his gun drawn ordering him to show his hands and Vega-Cruz's decision to drive toward Eulizier resulting in the discharge of his weapon. Based on undisputed facts Officer Eulizier could have reasonably believed he or others were about to be subjected to the risk of serious injury or death. The Defendant's use of force was reasonable and privileged and he is, at very least, entitled to qualified and discretionary immunity.

DEFENDANT: LAYAU EULIZIER


By:    //S//_____
        Elliot B. Spector
        (Fed Bar No. CT05278)
        Hassett & George, PC
        945 Hopmeadow Street
        Simsbury, CT 06070
        Direct: (860) 676-1115
        (860) 651-1888 facsimile
        Attorney for the Defendant

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOSE VEGA-COLON | : | 3:21-cv-00175-KAD |
| *Plaintiff* | : | |
| | : | |
| v. | : | |
| | : | |
| LAYAU EULIZIER, | : | |
| TOWN OF WETHERSFIELD and | : | |
| JOHN DOES | : | JANUARY 16, 2023 |
| *Defendants* | : | |

## CERTIFICATE OF SERVICE

I hereby certify that on the date first above a copy of the foregoing **MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's system.

> \_\_\_\_//S//_____
> Elliot B. Spector
> (Fed Bar No. CT05278)
> Hassett & George, PC
> 945 Hopmeadow Street
> Simsbury, CT 06070
> Direct: (860) 676-1115
> (860) 651-1888 facsimile
> Attorney for the Defendant