UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ANTHONY COLON AS ADMIN. OF THE<br>ESTATE OF ANTHONY VEGA-CRUZ | : <br>: <br>: | NO.: 3:21-cv-00175 (KAD) |
| v. | : <br>: | |
| LAYAU EULIZIER, ET AL | : | JANUARY 16, 2023 |

## **LOCAL RULE 56(A)1 STATEMENT OF UNDISPUTED MATERIAL FACTS**

Defendants, Town of Wethersfield and John Does I-XX, hereby submit this Statement of Undisputed Material Facts in support of their Motion for Summary Judgment in the above-captioned case. See D. Conn. L. Civ. R. 56(a)1.

1. On April 20, 2019, at approximately 6:00pm, Anthony Vega-Cruz (the "Decedent"), was driving his car on or near the Silas Deane Highway in Wethersfield, CT. (Plaintiff's Complaint, attached hereto as Exhibit A, ¶ 10).

2. Wethersfield Police Officer Peter Salvatore first saw the subject vehicle operated by the decedent in the driveway of Santander Bank on the Silas Deane Highway with its left-turn signal activated, while Officer Salvatore was traveling northbound. (Deposition of Peter Salvatore, attached hereto as Exhibit B, p. 21.)

3. Officer Salvatore observed the subject vehicle remain in the driveway even after traffic opened up to allow the subject vehicle to turn northbound onto the Silas Deane Highway. (Deposition of Peter Salvatore, Exhibit B, p. 22.)

4. After initially observing the subject vehicle, Officer Salvatore pulled into a parking lot north of Santander Bank and positioned himself to observe the flow of traffic on the Silas Deane Highway because he found it unusual that someone was coming out of the bank that was closed, given the time of day, and it was unusual that the vehicle didn't make the turn when traffic opened up after Officer Salvatore drove past Santander Bank. (Deposition of Peter Salvatore, Exhibit B, pp. 22-24.)

5. Before the subject vehicle moved from the parking lot of the second bank, Officer Salvatore drove to that parking lot to a position behind the subject vehicle so he could take down the subject vehicle's license plate number, which he did, before returning to the parking lot of the healthcare building. (Deposition of Peter Salvatore, Exhibit B. p. 28.)

6. Officer Salvatore ran a query on the subject vehicle's license plate from the MDT in Officer Salvatore's cruiser.  (Deposition of Peter Salvatore, Exhibit B, pp. 28-29.)  The query on the subject vehicle's license plate came back as registered to a Hyundai in Bristol, CT.  (Deposition of Peter Salvatore, Exhibit B, p. 29.)

7. In Connecticut, when the license plate does not match the vehicle, it is classified as a misdemeanor for misuse of plate pursuant to Connecticut General Statutes § 14-147, and a motor-vehicle violation.  (Deposition of Peter Salvatore, Exhibit B, p. 29; see also Deposition of Roger Clark, attached hereto as Exhibit G, p. 12.)

8. The suspect vehicle exited the parking lot and turned northbound onto the Silas Deane Highway. (Deposition of Peter Salvatore, Exhibit B, pp. 32-33.)

9. Officer Salvatore exited the parking lot he was parked in, turned northbound onto the Silas Deane Highway, and activated his lights to pull over the suspect vehicle. (Deposition of Peter Salvatore, Exhibit B, pp. 33-34.)

10. After Officer Salvatore activated his lights, the suspect vehicle pulled over, and Officer Salvatore then exited his vehicle. (Deposition of Peter Salvatore, Exhibit B, p. 36.)

11. Officer Salvatore had probable cause to stop the suspect vehicle. (Deposition of Roger Clark, Exhibit G, p. 73.)

12. Officer Salvatore exited his cruiser to approach the driver of the Infiniti and when he reached the area of the rear of the Infiniti the driver put the vehicle in gear and drove away northbound on the Silas Deane Highway. (Deposition of Peter Salvatore, Exhibit B, p. 36.)

13. After the Infiniti drove away from the initial traffic stop, Officer Eulizier heard Officer Salvatore's call for assistance over the radio, and while Officer Eulizier was monitoring the call, he realized that the other officers were occupied, so Officer Eulizier decided to assist Officer Salvatore with the traffic stop. (Deposition of Layau Eulizier, attached hereto as Exhibit C, pp. 20-21.)

14. Officer Eulizier first saw the suspect vehicle while he was traveling southbound on the Silas Deane Highway in order to respond to Officer Salvatore's location, and Officer Eulizier then saw the suspect vehicle traveling northbound on the Silas Deane Highway at a high rate of speed. (Deposition of Layau Eulizier, Exhibit C, p. 22.)

15. Officer Eulizier then activated the lights and sirens on his cruiser, and positioned himself in the middle of the roadway, while maintaining eyesight with the suspect vehicle. (Deposition of Layau Eulizier, Exhibit C, p. 22.)

16. Officer Eulizier noticed that the suspect vehicle was starting to lose control while driving towards Officer Eulizier's position, so Officer Eulizier executed a U-turn to avoid being struck by the oncoming suspect vehicle. (Deposition of Layau Eulizier, Exhibit C, pp. 22-23.)

17. The suspect vehicle passed Officer Eulizier, lost control, spun around 180 degrees, and came to a stop in the driveway to the parking lot with Wethersfield Pizza House. (Deposition of Layau Eulizier, Exhibit C, p. 23; Deposition of Stephanie Santiago, attached hereto as Exhibit D, p. 20.)

18. Officer Eulizier took this opportunity to position his vehicle in front of the suspect vehicle in an attempt to stop the erratic driving. (Deposition of Layau Eulizier, Exhibit C, p. 24.)

19. As Officer Eulizier was maneuvering his vehicle to get close to the front of the suspect vehicle, he misjudged the breaking of the vehicle, and Officer

Eulizier's vehicle made contact with the suspect vehicle.  (Deposition of Layau Eulizier, Exhibit C, pp. 24-25.)

20. After hitting the suspect vehicle, Officer Eulizier placed his vehicle in park and exited his vehicle.  (Deposition of Layau Eulizier, Exhibit C, p. 25.)

21. After exiting his vehicle, Officer Eulizier unholstered his firearm and started giving verbal commands to the driver to show Officer Eulizier his hands, while maintaining eye-contact with the suspect vehicle.  (Deposition of Layau Eulizier, Exhibit C, pp. 31-32.)

22. The suspect vehicle then began to move in an erratic manner, back into the roadway, now facing northbound in the southbound lanes.  (Deposition of Layau Eulizier, Exhibit C, p. 32.)

23. Officer Eulizier then began to move simultaneously with the suspect vehicle in order to maintain eye contact and keep a proper viewpoint of the operator through the front windshield because Officer Eulizier could not see through the driver side or passenger side windows due to the heavy tint.  (Deposition of Layau Eulizier, Exhibit C, p. 33.)

24. Based on the movement of the vehicle and the movement of Officer Eulizier in attempting to maintain a view of the front of the suspect vehicle, Officer Eulizier's body ended up being in front of the front driver's side of the suspect vehicle.  (Deposition of Layau Eulizier, Exhibit C, p. 54.)

25. Officer Eulizier is unsure of how far the suspect vehicle moved forward but is 100% positive that the suspect vehicle moved forward and accelerated

towards him before he fired his weapon. (Deposition of Layau Eulizier, Exhibit C, p. 60.)

26. Officer Eulizier moved as fast and as far away from the suspect vehicle as possible due to the imminent threat of the vehicle accelerating towards him. (Deposition of Layau Eulizier, Exhibit C, pp. 60-61.)

27. Officer Eulizier did his best to move backwards and away from the vehicle, but it was his belief that it was not humanly possible to move completely out of the way of the oncoming suspect vehicle before firing his weapon. (Deposition of Layau Eulizier, Exhibit C, p. 61.)

28. Officer Eulizier fired his weapon because it was his belief that he was going to be struck and killed by the vehicle. (Deposition of Layau Eulizier, Exhibit C, p. 64.)

29. If Officer Eulizier did not move from his position, roughly four feet in front of the suspect vehicle, the suspect vehicle would have struck Officer Eulizier. (Deposition of Roger Clark, Exhibit G, p. 80.)

30. Officer Eulizier fired his shots through the windshield of the suspect vehicle in an attempt to strike the driver. (Deposition of Layau Eulizier, Exhibit C, p. 71.)

31. After the shots were fired, Officer Salvatore put his vehicle in park, exited his vehicle, and drew his firearm. (Deposition of Peter Salvatore, Exhibit B, p. 71.)

32. Officer Salvatore then began coordinating responding officers and EMS to come to the scene via dispatch.  (Deposition of Peter Salvatore, Exhibit B, p. 73.)

33. Officer Eulizier radioed dispatch at 18:00:41 reporting shots fired. (Connecticut State Police Report on Recorded Emergency Communications, attached hereto as Exhibit E, p. 2.)

34. Dispatch radioed Aetna Ambulance, requesting an ambulance to respond to the location of shots fired at 18:01:09.  (Connecticut State Police Report on Recorded Emergency Communications, Exhibit E, p. 3.)

35. Officer Salvatore requested the ambulance stage at a local business City Fish, and the ambulance acknowledged the staging location, at 18:01:45. (Connecticut State Police Report on Recorded Emergency Communications, Exhibit E, p. 3.)

36. Officer Eulizier radioed dispatch to have the ambulance up to the scene from staging at 18:06:36, and the ambulance began  moving to the scene at 18:06:49.  (Connecticut State Police Report on Recorded Emergency Communications, Exhibit E, p. 4.)

37. The ambulance arrived on scene at 18:07:23.  (Connecticut State Police Report on Recorded Emergency Communications, Exhibit E, p. 4; see Patient Care Report, attached hereto as Exhibit I, p. 1.)

38. A Patient Care Report was created by emergency medical responders and signed by Camillo Quezada.  (See Patient Care Report, Exhibit I.)

39. The EMTs were at the side of plaintiff's decedent at 18:08.  (Deposition of Camilo Quezada, attached hereto as Exhibit H, p. 32; Patient Care Report, Exhibit I, p. 1.)

40. The decedent was never conscious when the responding paramedics treated him at the scene or in the ambulance to the hospital.  (Deposition of Camilo Quezada, Exhibit H, p. 19.)

41. The decedent would not have survived even if medical personnel arrived on scene earlier than they did.  (Deposition of Camilo Quezada, attached hereto as Exhibit H, p. 54.)

42. The injury suffered by the decedent is not survivable.  (Deposition of Camilo Quezada, attached hereto as Exhibit H, p. 58.)

43. The autopsy of the decedent shows a bullet entrance wound near the decedent's left eye.  (Deposition of Dr. James Gill, attached hereto as Exhibit F, p. 19.)

44. The autopsy of the decedent further shows that the path of the bullet traveled downward, front-to-back, and left to right, in the decedent's left temporal region.  (Deposition of Dr. James Gill, Exhibit F, pp.19-20.)

45. According to the dashcam footage from Officer Salvatore's cruiser, at one minute, forty five seconds (1:45) into the footage, the suspect vehicle begins to move forward, from the scene of the traffic stop.  (Deposition of Peter Salvatore, Exhibit B, p. 97, and Exhibit K video footage.)

46. At approximately 1:51 in Officer Salvatore's cruiser's dashcam footage, Officer Salvatore's cruiser begins to move forward.  (Deposition of Peter Salvatore, Exhibit B, p. 99, and Exhibit K video footage.)

47. At approximately 1:54 in Officer Salvatore's cruiser's dashcam footage, the suspect vehicle has started to swerve from the far-right northbound lane on the Silas Deane Highway into the adjacent, middle northbound lane.  (Deposition of Peter Salvatore, Exhibit B, pp. 99-100 and Exhibit K video footage.)

48. At approximately 1:56 in Officer Salvatore's cruiser's dashcam footage, the suspect vehicle has ended up in the southbound lanes on the Silas Deane Highway, five seconds after Officer Salvatore's cruiser began to move forward.  (Deposition of Peter Salvatore, Exhibit B, pp. 100-101 and Exhibit K video footage.)

49. On April 20, 2019, approximately 6:00 p.m. Officer Salvatore was on routine patrol in the vicinity of Santander Bank, which is located at 1221 Silas Deane Highway and was closed for business at the time.  (Affidavit of Peter Salvatore attached hereto as Exhibit J.)

50. As of that date Officer Salvatore was aware of reports of ATM tampering that resulted in theft of funds from bank customers.  (Affidavit of Peter Salvatore, Exhibit J.)

51. At the above date and time Officer Salvatore noticed an Infiniti vehicle in the parking lot of the closed bank and decided to watch it.  (Affidavit of Peter Salvatore, Exhibit J.)

52. Officer Salvatore observed the Infiniti vehicle move from the parking lot of the closed bank across the Silas Deane Highway to the parking lot of another closed bank.  (Affidavit of Peter Salvatore, Exhibit J.)

53. Officer Salvatore could not see the occupant(s) of the Infiniti vehicle due to its dark tinted windows, and my vantage point, and had no idea of the race or number of the occupants.  (Affidavit of Peter Salvatore, Exhibit J.)

54. Officer Salvatore saw the Infiniti had a registration place CT 484 YOS and determined it belonged to a different vehicle.  (Affidavit of Peter Salvatore, Exhibit J.)

55. Officer Salvatore had probable cause to conduct a traffic stop of the Infiniti vehicle based on the illegal use of license plate.  (Affidavit of Peter Salvatore, Exhibit J.)

56. The decisions whether to investigate, and how to investigate, for the possibility of a crime, and whether to make a traffic stop of a motor vehicle operator based on probable cause are within Officer Salvatore's judgment and discretion.  There are no department policies mandating whether a traffic stop should be made under the specific circumstances presented on April 20, 2019.  (Affidavit of Peter Salvatore, Exhibit J.)

57. When the Infiniti left the parking lot and headed north on the Silas Deane Highway, Officer Salvatore decided to make a traffic stop.  Officer Salvatore drove his police cruiser behind the Infiniti and activated the overhead lights, and the operator of the Infiniti pulled to the right-hand side of the Silas Deane Highway.  (Affidavit of Peter Salvatore, Exhibit J.)

58. Officer Salvatore exited his cruiser to approach the driver of the Infiniti and when he reached the area of the rear of the Infiniti the driver put the vehicle in gear and drove away northbound on the Silas Deane Highway. (Affidavit of Peter Salvatore, Exhibit J.)

59. Officer Salvatore rushed back to his police cruiser to follow in the direction of the Infiniti vehicle. This was within his judgment and discretion to do so. (Affidavit of Peter Salvatore, Exhibit J.)

60. Within three seconds of his placing his cruiser in "Drive" and moving forward he noticed the Infiniti spin out and lose control, approximately 200 feet ahead of him. (Affidavit of Peter Salvatore, Exhibit J.)

61. Officer Salvatore never got behind the Infiniti again, once it left the traffic stop. After the Infiniti lost control it came to a stop facing southbound, in the southbound lane of Silas Deane Highway, and partly in the driveway to an adjacent business. (Affidavit of Peter Salvatore, Exhibit J.)

62. As Officer Salvatore approached the Infiniti with his cruiser, it began to move quickly in reverse, resulting in the driver's side of the Infiniti striking the front right side of his cruiser. It was within Officer Salvatore's judgment and discretion as a police officer on how to approach the Infiniti, and there was no department policy mandating the specific manner of how Officer Salvatore was to act or react in this specific situation. (Affidavit of Peter Salvatore, Exhibit J.)

63. The Infiniti continued its movement quickly in reverse, onto the Silas Deane Highway travel path, stopping in a location where Officer Layau Eulizier was directly in front of it. (Affidavit of Peter Salvatore, Exhibit J.)

64. The Infiniti then moved forward from its stopped position, in the direction of Officer Eulizier who then fired his weapon. (Affidavit of Peter Salvatore, Exhibit J.)

65. The Infiniti then moved slowly across the Silas Deane Highway and into the parking lot of a business, where it came to a stop. (Affidavit of Peter Salvatore, Exhibit J.)

66. Officer Salvatore did not know whether any occupant of the Infiniti was armed or injured at that time. (Affidavit of Peter Salvatore, Exhibit J.)

67. Officer Salvatore began to approach the stopped Infiniti on foot, and determined that because it was unknown whether any of the occupants was armed with a firearm, he should take cover rather than immediately approach, until the safety of such an approach could be determined. There is no department policy mandating the specific manner of how an officer is to approach a vehicle under these circumstances, it is left to the officer's judgment and discretion. (Affidavit of Peter Salvatore, Exhibit J.)

68. The video marked as Exhibit K to the Town of Wethersfield's Motion for Summary Judgment is a recording from Officer Salvatore's cruiser camera of the incident, from the perspective of my police cruiser. This is the same video Officer Salvatore was shown and gave testimony about during his deposition on June 30, 2022. (Affidavit of Peter Salvatore, Exhibit J.)

        DEFENDANTS,
        TOWN OF WETHERSFIELD and
        JOHN DOES I-XX


By /s/ Thomas R. Gerarde
   Thomas R. Gerarde
   ct05640
   Howd & Ludorf, LLC
   65 Wethersfield Avenue
   Hartford, CT  06114-1192
   Ph:   (860) 249-1361
   Fax: (860) 249-7665
   E-mail: tgerarde@hl-law.com

**CERTIFICATION**

      This is to certify that on January 16, 2023, a copy of the foregoing Local Rule 56(a)1 Statement of Undisputed Facts was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

                                          /s/ Thomas R. Gerarde
                                          Thomas R. Gerarde