# Exhibit C

```
 1                 UNITED STATES DISTRICT COURT

 2                    DISTRICT OF CONNECTICUT

 3

 4   JOSE VEGA-COLON, INDIVIDUALLY AND     )
     AS ADMINISTRATORS OF THE ESTATE OF    )
 5   ANTHONY VEGA-CRUZ,                    )
                                           )
 6                 Plaintiffs,             )
                                           )
 7                 vs.                     )NO:
                                           )3:21-CV-00175 (KAD)
 8   LAYAU EULIZIER, TOWN OF WETHERSFIELD  )
     AND JOHN DOES 1-XX,                   )
 9                                         )
                   Defendants.             )
10   _____)

11

12

13

14       VIDEOTAPED REMOTE VIDEOCONFERENCE DEPOSITION OF

15                        LAYAU EULIZIER

16                     MONDAY, MAY 9, 2022

17

18

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  386725
```

1  fired your shot?
2      A.   I'm unsure on the specifics.  Roughly, a few feet.
3           Again, I'm not -- I'm unsure on the -- on the
4  specific range between myself and the individual.
5      Q.   Okay.  Do you know if any other officers shot in
6  that prior incident?
7      A.   Yes.
8      Q.   And did they?
9      A.   They did.
10     Q.   And did some of the other officers' shots strike the
11 individual, if you know?
12     A.   They did.
13     Q.   And do you know if that individual survived or
14 not?
15     A.   They did not.
16     Q.   Was a lawsuit brought in relation to that shooting,
17 if you know?
18     A.   No.
19     Q.   When you left the prior department, was there any
20 outstanding issues between you and the department?
21     A.   No.
22     Q.   So you left generally on good terms?
23     A.   Yes.
24     Q.   Okay.  So let's go back then to this incident.
25          It's my understanding you were in the process of

Exhibit C

 1  trying to have dinner?
 2      A.   Yes.
 3      Q.   And then you saw or heard the call come out?
 4      A.   Yes.
 5      Q.   And was there a fellow officer that you heard
 6  requesting assistance?
 7      A.   Yes.
 8      Q.   And who was the fellow officer?
 9      A.   That was Officer Pete Salvatore.
10      Q.   Okay.  And were are monitoring the radio to see if
11  someone was going to be able to help him?
12      A.   Yes.
13      Q.   And did it sound like one or more of the other
14  officers was occupied with other calls?
15      A.   They were.
16      Q.   At that point did you decide to help your fellow
17  officer?
18      A.   Yes.
19      Q.   What did you understand the nature of the call to
20  be?
21      A.   I just understood at the time the officer -- Officer
22  Salvatore stopped a vehicle and that he was -- and that he
23  was requesting backup.
24      Q.   Okay.  Now, it's my understanding the vehicle
25  involved was an Infiniti; does that sound right?

Exhibit C

1    A.    Yes.

2    Q.    Where was the Infiniti when you first saw it?

3    A.    When I first saw the Infiniti?

4    Q.    Yes.

5    A.    That was when I was responding to Officer

6  Salvatore's location.  I was driving southbound on the Silas

7  Deane Highway, and then I saw the vehicle, the Infiniti,

8  driving northbound at a high rate of speed.

9    Q.    Okay.  Could you tell at that point how many people

10 were in the Infiniti?

11   A.    No.

12   Q.    Could you tell if there were any backseat passengers

13 at that point?

14   A.    No.

15   Q.    Did you at some -- what did you do in relation to

16 initially seeing the Infiniti as you described?

17   A.    I activated my lights and the siren of the police

18 cruiser that I was in, and then I positioned my vehicle in

19 the -- in the essentially the median, the double yellow

20 median of the roadway.  I then -- to -- and while also

21 maintaining eyesight with that vehicle.

22   Q.    Okay.  And did you follow the vehicle for some

23 distance or get behind it at some point?

24   A.    I did.  After the vehicle started -- as we were

25 continuing to watch the vehicle, I saw that it started to

1   lose control, and then there was -- so while I was driving

2   northbound -- again, it was raining at this time.  I was

3   driving northbound on the Silas Deane Highway and onto the

4   southbound.  I'm looking at the vehicle.  It's driving

5   towards -- it's driving towards me essentially, and I saw

6   that it's starting to lose control.  So therefore, I tried to

7   do a U-turn to move out the way and to avoid an impact with

8   that vehicle.  At that point, the vehicle passed me and then

9   again it was still continuing to lose control, and then it --

10  and then it -- it lost control in a 180 manner and ended up

11  right in the parking lot where I -- I had departed to respond

12  to Officer Salvatore.

13      Q.   Okay.  And what parking lot was that?

14           Was that the parking lot of --

15           (Simultaneously speaking.)

16      A.   I don't know the exact numeric of the street, but

17  it's the parking lot that contains the -- store, the food

18  restaurant that I was going to -- at that building as well.

19      Q.   Okay.  Now up to that point in time, did you know

20  what the initial reason for the traffic stop was?

21      A.   No.

22      Q.   Did you have any information, for example, that the

23  individual or individuals in the car were armed with

24  weapons?

25      A.   No.

1    Q.   Any information that they had committed some type of
2    serious crime?
3    A.   At that time, no.  Besides fleeing the scene or
4    fleeing or engaging a pursuit from Pete Salvatore's traffic
5    stop, that -- that was at that point and then the reckless
6    driving.
7    Q.   Right.  But that's something you observed;
8    correct?
9    A.   Yes.
10   Q.   I'm just wondering if you had any other information
11   that they had been involved in some crime of violence or a
12   serious crime or something like that.
13   A.   That was unknown at that time.
14   Q.   Okay.  Now, at some point did you decide to get out
15   of your vehicle?
16   A.   Yes.
17   Q.   And where did you bring your vehicle to a stop
18   before you got out?
19   A.   I brought my vehicle to a stop as -- as -- as I was
20   trying to stop or position my vehicle in front of the suspect
21   vehicle.  As he became or turned or lost control in the 180
22   fashion, that was my opportunity to face my vehicle in front
23   of his vehicle to first stop all erratic driving.  At that
24   time as I was trying to position my vehicle in front of his
25   vehicle, I attempted to brake as I was bringing it to a

1  closer or close to the front of that vehicle, and I misjudged
2  my braking, and the -- and the vehicle actually struck in
3  front of that vehicle.  And so like -- and then at that time
4  after it struck the vehicle right at the end, it made impact
5  with that vehicle.  I placed my cruiser in park, and then I
6  exited -- I exited out of the driver's side.
7     Q.   Okay.  Thank you for that.
8          Did you ever get out of your vehicle -- strike that.
9          Did you ever get back in your vehicle again at any
10 time before the shooting?
11    A.   No.
12    Q.   And do you have an estimate as to how much time
13 passed from you getting out of your vehicle to the time you
14 fired your two shots?
15    A.   Not a strong estimate, no.
16    Q.   Do you have any general estimate?
17    A.   Couple seconds.  But no, no general estimate.
18    Q.   Okay.  So just to follow up from what you said, when
19 you were approaching the front of the Nissan, were you
20 intending to strike it?
21    A.   No.  I was -- I was intending to -- to slow my
22 vehicle down which I did and to brake and to place the
23 vehicle on the brake.
24    Q.   Okay.  So your intent was kind of to block it in
25 from the front, but not to strike it?

Exhibit C

 1      Q.   Okay.  Because it also references an officer
 2  Hilchuk?
 3      A.   Yes.
 4      Q.   But that was a separate incident?
 5      A.   Yes.
 6      Q.   Okay.  Thank you.  All right.
 7           So let's go back now to this incident, and we're up
 8  to the point in time where your vehicle made impact with the
 9  front of the Infiniti, and then you got out of your vehicle.
10           Are you with me in terms of the time?
11      A.   Yes.
12      Q.   And what did you do immediately after getting out of
13  your vehicle?
14      A.   I unholstered my firearm and I started to give
15  commands to show me your hands.
16      Q.   Okay.  Were you wearing a body cam at the time?
17      A.   No.
18      Q.   Do you know if your vehicle was equipped with any
19  video equipment?
20      A.   Yes.
21      Q.   And what did you refer to that as?
22      A.   What did I refer to the video, the MVARS video?
23      Q.   Yeah.  Some people call it -- some people call it
24  dash cams, but different agencies have a different term.
25      A.   We call it universally either the dash cam or watch

Exhibit C

1   guard.

2      Q.   Okay.  So after you pulled your firearm out, I'm
3   assuming you're still looking at the Infiniti; is that
4   correct?

5      A.   Yes.

6      Q.   And did the Infiniti move positions at all that you
7   observed after the vehicle impacted it?

8      A.   So after the vehicle impacted it?  Or after I was
9   out the vehicle?

10     Q.   However you're comfortable in describing it.

11     A.   Well, after I exited --

12          (Simultaneously speaking.)

13     Q.   In other words --

14     A.   After I exited out of the cruiser with the handgun
15  drawn and giving the commands looking at the Infiniti,
16  simultaneously as I'm looking at the -- at the Infiniti and
17  the -- and the operator, the vehicle the operator started to
18  make furtive movements to the steering wheels and further
19  movements underneath from -- from what I can't see from my --
20  from my viewpoint at that time.  And then the Infiniti starts
21  to move to continue to move in an erratic manner now back
22  into the roadway and I believe facing northbound in that
23  southbound lane at that time.

24     Q.   Okay.  And up to that point in time had you fired
25  any shots?

1    A.   No.

2    Q.   So now, is the Infiniti facing northbound?

3    A.   So to continue -- continue from where I left off,
4  again, everything happened in a simultaneous manner.  So
5  as -- so as I exited the vehicle and saw the furtive
6  movements and saw -- saw the operator start to maneuver the
7  vehicle erratically and start to face the northbound of the
8  southbound lanes, and then I start to move to -- to maintain
9  eye contact to maintain contact and a proper viewpoint with
10 the operator, the -- the vehicle itself was heavily tinted
11 besides the front windshield.  So you were unable to see
12 through the windows of the front passenger, the front driver
13 side, and then -- well, both passenger and driver side
14 windows and the rear windshields.  You were only able to see
15 through the front windshield of the vehicle.

16   Q.   Okay.  So I just want to make sure I'm understanding
17 your testimony correctly.

18        When you initially impacted the front of the
19 Infiniti, which compass direction was the -- was your vehicle
20 facing?

21   A.   I was facing northbound or northwestbound because
22 the Infiniti was at some point at an angle in the -- in the
23 halfway in the drive -- in the driveway to that side of
24 business.

25   Q.   Okay --

1   separating the northbound and southbound lanes?
2      A.   There are.  But also depends on where you are on the
3   roadway, it could be as many as five lanes there as well or
4   ten lanes, but I believe that that in section there were four
5   lanes.  Two for northbound, two for southbound.
6      Q.   And do you recall where the Infiniti was in relation
7   to the divider between the northbound and the southbound
8   lanes when it was facing northbound?
9      A.   The vehicle was in the northbound lane -- I'm sorry,
10  the vehicle was facing northbound in the southbound lane I
11  believe in the -- in the left most lane of the southbound
12  lane on the Silas Deane Highway facing northbound.
13     Q.   Okay.  So if -- if the No. 1 would be the lane
14  closest to the center, do you believe it would be in that
15  lane?
16     A.   I believe so.
17     Q.   Now, where were you coming from before you ended up
18  somewhere in front of the car?
19     A.   While I was maintaining contact or -- or -- for the
20  view of the front of the vehicle, I was coming from the front
21  of my vehicle, and, again, just based off the movements and
22  the dynamics of the situation and the way that the vehicle
23  was -- was positioned, the way that -- that the operator's
24  vehicle was positioned, my body ended up being in front of
25  the driver's side, the front driver side of that vehicle.

1    A.   Possibly.  Yes --
2         MR. GERARDE:  Objection to form.
3   BY MR. GALIPO:
4    Q.   Do you think it could have been more in the area of
5   two or three feet forward before you fired your first shot?
6    A.   I don't --
7         MR. GERARDE:  Objection to form.
8   BY MR. GALIPO:
9    Q.   Do you have any estimate as to the speed of the
10  car?
11   A.   No.
12   Q.   Do you know if it was more or less that three
13  miles-an-hour?
14        MR. GERARDE:  Objection to form --
15        THE WITNESS:  I'm unsure.
16  BY MR. GALIPO:
17   Q.   Okay.  So would it be fair to say that you're unsure
18  if it moved forward more or less than five feet?
19   A.   I'm sure that the -- I'm sure that the vehicle moved
20  forward.  I'm 100 percent positive that the vehicle moved
21  forward.  I'm primarily unsure of the distance as to -- as to
22  how far the vehicle moved forward prior to -- prior to shots
23  being fired, but I'm sure that the vehicle moved forward and
24  accelerated towards me.  As far as if it moved five or ten
25  feet, I -- I -- I cannot specify a factual measure because I

```
 1   would not be -- I would not be able to do so.
 2        Q.   Okay.  And same thing with speed, you could not give
 3   an estimate?
 4        A.   No.
 5        Q.   Did the vehicle ever strike you at any time?
 6        A.   Did the vehicle strike me?
 7        Q.   Yes.
 8        A.   The vehicle did not strike me.
 9        Q.   Did you ever dive out of the way to the ground?
10        A.   Did I dodge out of the way?
11        Q.   Yeah.  Did you -- did you dive to the ground to get
12   out of the way?
13        A.   No.  I did my best to move -- to move as fast as and
14   as far as possible away from the vehicle after the shot was
15   fired due to that imminent threat.
16        Q.   Did you ever consider trying to move out of the way
17   before you fired your shots?
18        A.   I did my best to do so, and based off of my -- my --
19   my -- my feet movement at that time, it was my belief that
20   was not humanly possible to do so.
21        Q.   What did you do to try to move out of the way before
22   the shots?
23        A.   To move -- to move backwards for -- primarily to
24   move backwards and away.
25        Q.   Would that be backwards and to your right?
```

Exhibit C

1   A.   Because at this point I'm focused on my well-being
2  and my -- and my future endeavors, and my goal is to move
3  forward.
4   Q.   Okay.  Are you still with the department?
5   A.   No.
6   Q.   When were you last with the department?
7   A.   April 15, 2020.
8   Q.   And do you know -- why are you no longer with the
9  department?
10  A.   I chose to resign voluntarily due to threats against
11 my family.
12  Q.   Okay.  Before you gave your statement, did you
13 review dash cam video?
14  A.   Prior to giving the statement to the State Police?
15  Q.   Yes.
16  A.   I just saw a brief, a few seconds of it, but then --
17 but then only that, and they were notified of such.
18  Q.   Okay.  When you fired your shots, did you see if the
19 driver of the vehicle had his hands on the steering wheel?
20  A.   I cannot recall.
21  Q.   Did you shoot the driver because you thought the
22 driver had a gun?
23  A.   The shots were fired due to my belief that I was
24 going to be struck and killed by the vehicle.
25  Q.   Well, did you shoot for any other reason?

1  they were pretty much back-to-back; is that correct?
2      A.   Yes.
3      Q.   And you were firing through the windshield
4  attempting to strike the driver?
5      A.   Yes.
6      Q.   And the vehicle was south of you at that point; is
7  that true?
8      A.   Yes.
9      Q.   So what I'm asking is, after the two shots, and you
10 moved backwards and to the right to get out of the path of
11 the vehicle, I'm taking the vehicle was still south of you,
12 not past you?
13     A.   No.
14     Q.   When you moved out of the path of the vehicle, was
15 the vehicle still south of you moving in a north direction?
16     A.   As I'm moving, the vehicle is still moving, and
17 it's -- and it has continued to move past me prior to coming
18 to a rest on the northeastern sides of the Silas Deane
19 Highway from the location of where the shots were fired.
20     Q.   Okay.  But would you at least agree that after the
21 two shots, you moved backwards and to the right to get out of
22 the path of the vehicle?
23          MR. SPECTOR:  Objection.
24          THE WITNESS:  After the shots were fired, the car,
25 the vehicle is still moving and I'm moving and the level of

```
 1                     CERTIFICATE

 2                         OF

 3         CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

 4

 5           I, JINNA GRACE KIM, CSR No. 14151, a Certified

 6   Stenographic Shorthand Reporter of the State of California,

 7   do hereby certify:

 8           That the foregoing proceedings were taken before me

 9   at the time and place herein set forth;

10           That any witnesses in the foregoing proceedings,

11   prior to testifying, were placed under oath;

12           That a verbatim record of the proceedings was made

13   by me, using machine shorthand, which was thereafter

14   transcribed under my direction;

15           Further, that the foregoing is an accurate

16   transcription thereof.

17           I further certify that I am neither financially

18   interested in the action, nor a relative or employee of any

19   attorney of any of the parties.

20

21           IN WITNESS WHEREOF, I have subscribed my name, this

22   date:  May 9, 2022.

23
                         _____
24                        Jinna Grace Kim, CSR No. 14151
25
```

Exhibit C